IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**HARLAN HENRY**,                                                    Civil Case No. 09-480-KI

                        Plaintiff,

                                                                OPINION AND ORDER

        vs.

**JOHN E. POTTER,** Postmaster General**,**

                        Defendant.


            Elizabeth Farrell Oberlin
            Attorney at Law
            P.O. Box 3614
            Hillsboro, OR 97123

                    Attorney for Plaintiff

            Dwight C. Holton
            United States Attorney
            District of Oregon


Page 1 - OPINION AND ORDER

James E. Cox , Jr.
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204

     Attorneys for Defendant


KING, Judge:

Plaintiff Harlan Henry, an African American, is a long-time employee of the United

States Postal Service ("USPS") who filed an EEO complaint of discrimination which resulted in

a written settlement agreement in 2006.  Henry alleges the USPS discriminated against him in

several ways, including by failing to comply with its end of the bargain in the settlement

agreement, by failing to recommend him for a position in another state, and by subjecting him to

a hostile work environment.  In this action, Henry alleges claims for race[1] discrimination and

retaliation under Title VII.  Before the court is Defendant's Motion for Summary Judgment

(#18).  For the reasons below, I grant the motion in part.  Portions of the disparate treatment and

hostile environment race discrimination claims will proceed to trial.

## FACTS

I.    <u>History at Portland District</u>

Charles Collins, an African American, was appointed Diversity Coordinator in 2004 and

retired from the USPS in 2007 after 23 years.  Collins states that he observed race discrimination

in the Portland District throughout his employment.  In 2005, Collins and other USPS employees,

---

[1] Henry also alleged Title VII claims for sex discrimination (Claim Three) and retaliation
for complaining about sex discrimination (Claim Four).  When counsel conferred about this
motion, plaintiff agreed to dismiss both claims.  I dismiss both Claims Three and Four with
prejudice.

Page 2 - OPINION AND ORDER

including Henry, participated in a roundtable meeting in Portland in which the Vice President of

the Western Region of the USPS traveled to Portland to address complaints of race

discrimination and abuse of authority in the District.  Collins believed he was denied a promotion

during his career because of race discrimination.

Other employees have made complaints of race discrimination in the Portland District,

including other African Americans and Kathi Clapp, a Native American.

II.    Human Resources

Douglas Batchelor was the Manager of Human Resources for the USPS Portland District

in 2006 and 2007.

On March 23, 2006, Henry and the USPS entered into a written Settlement Agreement

resolving Henry's 2005 EEO Complaint.  The Settlement Agreement gave Henry a spot in the

next Associate Supervisor's Training Program ("ASP") and a detail of at least 90 days in Human

Resources in the Portland District.  Batchelor was not present at the mediation but signed the

settlement agreement as the District agency representative.

Henry was detailed to a position as a Human Resources Specialist in the Postal Employee

Development Center of Human Resources from April 29 to July 28, 2006.  He began attending

the ASP in September 2006 and graduated on January 5, 2007 after completing on-site training at

a Customer Service station.  Henry chose to train in customer services rather than in delivery

operations.

Dallas Keck was the District Manager of the Portland District from January 2000 through

September 2008.  Shortly before Henry graduated from the ASP, Keck met with Henry and

Batchelor about Henry's desire to detail into Human Resources or to transfer to the Human

Resources Shared Services Center ("HRSSC") in Greensboro, North Carolina.  At that time, the

USPS was migrating much of the personnel processing work from individual postal districts to

the HRSSC.  Keck offered to contact Nancy James, the Manager of the HRSSC, to check on

detail opportunities.  Keck called James and explained that he had an employee, Henry,

interested in working at the HRSSC.  Keck reported that Henry was working a detail in Human

Resources in the Portland District to make him more competitive for an HRSSC position, if he

applied.  James stated that all positions at the HRSSC are filled by a competitive process and that

she could not accept Henry on a noncompetitive basis.  She did state that there might be

opportunities available during phase two of the shared services migration process if the person

had experience in the job bidding area.  James had a similar discussion with Batchelor at a USPS

Human Resources meeting later in 2007.

Keck explained the possible future HRSSC opportunity to Henry and offered to detail

him into Human Resources to learn the job bidding process.  Henry agreed and Batchelor

implemented the arrangement.  The National Association of Postal Supervisors ("NAPS")

complained about Henry's placement in a detail instead of being assigned to a station.  Henry

was an EAS-15 Associate Supervisor.  Keck asked Batchelor to encourage Henry to apply for

EAS-17 supervisor vacancies because that level of supervisor is routinely detailed to the District.

Batchelor encouraged Henry to do so and told him his selection would not shorten his Human

Resources detail.  Batchelor did not tell Henry, however, that he would never work at his

assigned station.  Batchelor did state that some details last for years and the employee is never

returned to the assigned station.

In March 2007, Henry applied for and was selected for the EAS-17 position of Supervisor, Customer Services, at Multnomah Station. He continued to serve in his detail in Personnel, even though he was formally assigned to Multnomah Station.

In March or April of 2007, Henry applied for a position at the HRSSC. He did not tell Batchelor that he had done so but informed Janet Schulz, Henry's direct supervisor, because Henry thought that she might be contacted as a reference.

In June 2007, Henry toured the HRSSC while on vacation in North Carolina. He met with James, who made it clear that he would have to apply for any position there. Henry eventually applied for three HRSSC positions on April 25, 2007, August 16, 2007, and January 3, 2008. James was not on the selection committee for any of those openings.

At some point in late spring or early summer of 2007, Henry asked Batchelor for advice about an EAS-21 vacancy at the HRSSC that did not involve job bidding work. Henry did not inform Batchelor that he had applied for the job. Batchelor said there was no harm in applying but commented that Henry would be competing against applicants with experience and education in the field. Henry told Batchelor that he thought the settlement agreement required the USPS to put him in a senior manager position within two years of the date of the agreement. There is no mention of this in the written agreement. Batchelor told Henry he was unaware of that requirement. Henry never told Batchelor if he applied for the EAS-21 position, or for any other position at HRSSC.

On June 21, 2007, David Jarvis, President of Local 315 of the National Postal Mail Handlers Postal Union, wrote a letter to Kim Anderson, Senior Plant Manager in the Portland District, in which Jarvis complained about several union concerns, including the way Henry

handled job postings.  Anderson asked Batchelor to follow-up on some of the issues.  Batchelor

spoke to Janet Schulz, Henry's direct supervisor and head of the Personnel section, and learned

there had been errors in the bidding process which was affecting the migration to the HRSSC and

causing an increase in union grievances.

Batchelor met with Henry to discuss these issues so that Henry could learn from the

problems and correct them.  Batchelor routinely met with employees in Human Resources to

address problems in meeting the department's obligations.  He asked Henry to focus on

correcting any bidding errors listed in the letter from Jarvis.  Batchelor did not take any type of

disciplinary action against Henry as a result of the issues Jarvis raised.  Henry believes that many

of the issues were not his responsibility, and that Batchelor took Jarvis's complaints at face value

without investigation.

At the meeting, Henry stated that he was ready to work at the HRSSC.  Batchelor told

Henry that unless he applied for a specific position, the possibility of a detail assignment at the

HRSSC would most likely not occur until Henry was better versed in all aspects of craft bidding,

a very complex process.  Batchelor did not know if any detail opportunities were available.  He

told Henry that if an opportunity materialized at the time, he could not recommend Henry

because he had not demonstrated knowledge of the bidding process for all crafts.  Batchelor

added that if Henry wanted to go to the HRSSC immediately, he had a better chance by applying

for a Professional and Specialist Trainee EAS-16 position if one was posted.  This position, a

two-year program to train a person in all aspects of personnel operations, is a career ladder

position in which the trainee is typically promoted to an EAS-17 after one year and then

promoted to an HR Generalist or some other position at the EAS-18 level after the second year.

Henry said he was not interested because he was already an EAS-17.

Batchelor did not meet with Henry after June 28, 2007.  Henry continued to work the job

bidding detail in Personnel until the work was phased out as scheduled in September 2007.

Batchelor was never asked to provide a reference or recommendation for any candidates for any

vacancies at the HRSSC, including Henry, and did not provide any on his own initiative.  He had

no role in the hiring process for EAS positions at the HRSSC.

III.    Multnomah Station

Anthony Spina-Denson was the Customer Service Manager at Multnomah Station ("the

Station") from January 2008 to September 2009.  Spina-Denson is African American; his mother

is Caucasian.  Kathi Clapp, a Native American, is the Manager of Customer Service Operations

for the USPS in Portland, including Multnomah Station.  Clapp is the direct supervisor for Spina-

Denson and the second-line supervisor for Henry during his assignment there.  Henry became

closing supervisor at Multnomah Station in September 2007.

Henry claims that Spina-Denson constantly badgered and hounded him, monitored his

work, and harassed him about his duties, family, FMLA leave, and attendance.  Henry states that

Spina-Denson did not treat the other supervisors in this manner.  Henry observed Spina-Denson

require supervisors to monitor African-American carriers multiple times a day on their routes but

to monitor Caucasian carriers only occasionally.  Henry observed Spina-Denson treat Rochelle

Denton, an African American clerk, with extreme hostility.

The Portland District requires an annual 3999 inspection for each carrier route.  On a

mounted route, the carrier stays in his vehicle during the entire route.  In a park and loop route,

the carrier parks his vehicle and walks in a loop to deliver the mail.  Over 20 EAS employees in

the Portland District, including Spina-Denson, performed 3999 inspections at stations other than

their own to help meet the requirement. Except for the opening supervisor whose shift ended too

early, all supervisors and the manager at Multnomah Station performed 3999 inspections.

Closing supervisors are responsible for correcting any errors in the Time and Attendance

Control System ("TACS") and the Delivery Operations Information System ("DOIS").  One of

the primary duties unique to the closing supervisor is to ensure that all available mail is

dispatched from the station to the mail processing center when the station closes.  A dispatch

failure occurs when all of the outgoing mail is not dispatched to the mail processing center.  To

prevent a dispatch failure, the closing supervisor uses a checklist and a map of the station to

check all areas of the station where outgoing mail might be present.  The closing supervisor then

initials a Daily Verification of Dispatch Log and a block on the daily supervisor sheet to verify

that dispatch has been completed.

One evening in January 2008,[2] Spina-Denson called Henry after he left the station

because the tour superintendent's office told Spina-Denson that a collection box was not scanned

as collected for that day.  That office gave Spina-Denson several phone numbers on which to

leave messages for Henry.  When Spina-Denson could not reach Henry, he asked Julie Pimental,

a Caucasian supervisor at the Station, to collect the mail and take it to the distribution center,

which she did.  The next day, Henry told Spina-Denson that he had called Henry's daughter's

phone.  Spina-Denson apologized and never called the number again.

---

[2]  The remaining dates in the Facts section are in 2008 unless otherwise stated.

On February 28, Henry emailed the Portland Postmaster to complain about Spina-Denson's management style but did not mention racial animus.

On March 4, Henry began a scheduled 90-day detail at the Mount Hood DDC. He asked for the detail to end on April 25, which was earlier than scheduled. Henry complained that he had been accused of defamatory statements about management and accused of other performance problems at Mount Hood DDC. In Henry's opinion, neither incident was properly investigated.

When Henry returned to Multnomah Station on April 28, Spina-Denson was on a detail at another station so the two did not work together again until June 2. On that day, Spina-Denson met with Henry to explain that he wanted to overcome their bumpy past and work together to make the Station and Henry's career successful. Henry responded by stating that he was not assigned to Multnomah Station and was expecting a phone call to confirm that. Henry stated that the only solution for the two to work professionally together was for Spina-Denson to approve Henry taking all of his annual leave.

On June 3, Spina-Denson sent Henry an email explaining the procedure for conducting 3999 inspections later that week.

On June 4, Henry wrote the national officers of NAPS to complain about Spina-Denson's management style and to express concerns about a potential for violence. The only reference to racial animus in the letter is a statement that in Spina-Denson's wake, "a wave of grievances and EEOs always follow." Cox Am. Decl. Ex. 17. NAPS passed the complaint on to Keck. The Portland District initiated an eleven-day investigation into the allegations which produced a 48-page report concluding that there was no basis for Henry's allegations.

Page 9 - OPINION AND ORDER

On June 5, Spina-Denson assigned Henry a 3999 inspection for a mounted route. Henry said he could not do a mounted route because he could not keep his knee in a crouched position for that long. He offered to bring in medical documentation but Spina-Denson said he did not want it. Because Henry did not have any approved work restrictions, Spina-Denson told him to take breaks during the route to stretch his leg. Henry did not follow Spina-Denson's suggestion to get out of the truck and stretch during the 3999 inspection. On his return to the Station, Henry told Spina-Denson that he had aggravated his knee injury. In the opinion of Henry's orthopedist, Henry reinjured his knee, which had a prior repair to the tendon, by keeping the knee in a flexed posture for an extended period during the inspection. Henry filed a worker's compensation claim concerning the knee reinjury, and the USPS accepted the claim.

On June 7, Henry was the closing supervisor when Multnomah Station had a dispatch failure for three pieces of international Express Mail. This was Henry's third dispatch failure as closing supervisor at the Station. A dispatch failure involving Express Mail is particularly serious because of the USPS money-back guarantee. Clapp investigated because Henry's recent charges of abusive management practices against Spina-Denson were still under investigation. Clapp determined that Henry had been trained on dispatch procedures, that he had completed some of his checklists properly, that he had failed to initial the Daily Verification of Dispatch Log, and that a closing clerk had notified Henry about the express parcels. Henry did not think the parcels were for international delivery. On June 20, Clapp gave Henry a Letter of Warning about the June 7 dispatch failure.

On June 12, Spina-Denson met with Henry for 25 minutes to discuss Henry's job responsibilities. Henry asked for written instruction on his daily assignments. The next day,

Spina-Denson emailed Henry a detailed flow chart listing his responsibilities as closing supervisor. Henry's assignments in the flow chart were the same assignments Spina-Denson gave to the acting closing supervisors when Henry worked a detail at Mt. Hood DDC.

On June 17, Spina-Denson met with Henry to discuss several work performance issues arising the day before, including errors in the TACS system that Henry failed to correct even though he initialed the daily supervisor checklist that he had made the corrections, failure to complete the carrier case checks, and working overtime without authorization by working through lunch. Henry told Spina-Denson to fast-forward everything and issue the letter of warning so that Henry could do what he needed to do.

On June 20, Henry provided Clapp with medical documentation restricting him from performing 3999 inspections on mounted routes. Clapp accepted the documentation but told Henry that he would still have to perform 3999 inspections on park and loop routes that fit within his medical restrictions. Henry was unable to perform 3999 inspections at over half the routes at Multnomah Station under the medical restrictions.

On June 26, Clapp gave Henry a proposed Letter of Warning in lieu of a seven-day suspension for failure to perform his duties. Henry had another dispatch failure which involved Priority Mail. He also failed to complete the inventory log for the Arrow/Modified Arrow Lock keys that control the collection boxes in part of the city. An Arrow key was missing from inventory but was found after Clapp issued the discipline. If the key had not been found, USPS would have had to replace locks at a cost of $25,000. Henry exercised his right to mediation but it did not result in an agreement. When Henry sent no further response to the Postmaster of the City of Portland, Shawneen Betha, she adopted the Letter of Warning in lieu of a seven day

Page 11 - OPINION AND ORDER

suspension on October 10.  Henry states that the problems were caused by his overwhelming

workload that day, including carriers running out of gas and having an accident.

Clapp has also disciplined Caucasian employees for failure to perform their duties.  As

one example, she issued a Letter of Warning in lieu of a seven-day suspension to a Caucasian

station manager on June 26.

On June 27, Spina-Denson instructed Henry to conduct an investigative interview of the

closing clerk based on a dispatch failure occurring the previous day.  Henry did not conduct the

interview.

On July 8, Clapp met with Henry and Spina-Denson.  She told them that Multnomah

Station and some other stations in the district would have to provide supervisors to assist other

stations in completing 3999 inspections.  Clapp offered this as a good opportunity for Henry to

work away from Spina-Denson for a while.  Henry told Clapp that the only thing she could do to

help him would be to help him get a job in North Carolina.  He also told Clapp that he needed

time off work to attend a medical appointment for his wife.  Because Henry's FMLA leave for

his wife's medical condition was pending, Clapp checked the procedure and told Henry on

July 11 to send documentation of the appointment to the FMLA office.  Spina-Denson required

documentation of all employees at Multnomah Station to support requests for FMLA leave,

including one of the Caucasian supervisors who had FMLA leave approved in August 2008.

On July 10, Clapp schedule Henry to perform a 3999 inspection on a park and loop route

at Forest Park Station.  Henry complained to Clapp in an email:  "It appears my on the job injury

caused by my managers neglect to accept medical documentation has apparently qualified me to

be 'farmed/sharecropped' to other stations in the city."  Clapp Decl. Ex. 8.  After several

paragraphs of complaint, Henry closed the email with the comment, "In particular it is extremely disturbing that it appears this aggression is based on race." Id.  Following Henry's complaint, Clapp did not require him to perform the inspection, even though many employees were performing the inspections at stations other than their own.  Henry never looked at the route to see if he could complete the inspection without violating his new medical restrictions.

On August 11, 2008, Henry filed an EEO Complaint complaining of race discrimination. Cox Am. Decl. Ex. 20.

On August 14, Clapp gave Henry a second proposed Letter of Warning in lieu of a seven-day suspension for failure to conduct an investigative interview, as requested by Clapp and Spina-Denson, for failure to verify the Daily Dispatch, and for raising his voice at two subordinates.  Betha also adopted this Letter of Warning on October 10, 2008.[3]

Henry received approval for FMLA leave for his wife's medical condition, including for the medical emergency she had on August 22, 2008.  In making the determination, Debra Neal asked Henry to verify the length of his marriage to his wife and whether his wife's medical condition was related to drug abuse.  Clapp later requested medical records for the already-approved leave.  Henry told her this was inappropriate.

Spina-Denson held daily supervisors' meetings at Multnomah Station.  He did not counsel Henry or any other supervisors on their performance issues in front of their colleagues. Henry would occasionally confront Spina-Denson over issues in the presence of other employees. According to Henry, Spina-Denson would then meet with the three other supervisors, without

_____

[3]  Henry's counsel agrees that this Letter of Warning is not evidence of discrimination or retaliation in this action because it was issued a few days after the August 11, 2008 EEO complaint which forms the basis of this action.

Henry, dismiss the others, then meet separately with Henry.  This occurred nearly every day.

Henry is unaware if Spina-Denson reviewed the work of the other supervisors and is not in the

building as early as the others.

In January 2009, Henry requested and received an assignment to Plant.  He is now

working as a clerk instead of a supervisor.  On January 20, 2009, Henry's doctor lifted his light

duty restriction after Henry informed him that his job changed to one which allowed him to sit

part of the time and to walk part of the time, making the light duty restriction no longer

necessary.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

court "must view the evidence on summary judgment in the light most favorable to the

non-moving party and draw all reasonable inferences in favor of that party."  Nicholson v.

Hyannis Air Service, Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (internal quotation omitted).

**DISCUSSION**

I.    Subject Matter Jurisdiction

Defendant argues that Henry cannot now raise a claim based on the June 26 Letter of

Warning in lieu of suspension because he did not raise this discrete adverse employment action

during the 2008 administrative EEO process.

To establish federal subject matter jurisdiction over an employment discrimination claim,

the plaintiff must have raised that claim or a claim that is "like or reasonably related" to it in an

administrative action.  Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1480

(9th Cir. 1997) (internal quotation omitted).  The EEOC charge must be construed "with the

utmost liberality."  Id. (internal quotation omitted).  The court has subject matter jurisdiction over

allegations of discrimination that either "fell within the scope of the EEOC's *actual* investigation

or an EEOC investigation which *can reasonably be expected* to grow out of the charge of

discrimination."  Id. (internal quotation omitted, emphasis in the original).

Henry submitted a multi-page narrative with his August 11, 2008 EEO Complaint.  The

narrative states, "As of July 31, 2008 I've been given a letter of warning which in sense means

that the next step will be a 7 day suspension . . . ."  Cox Am. Decl. Ex. 20, at 6.  This statement

followed Henry's discussion of excessive supervision, 3999 inspections, requests for medical

documentation, all failures at the Station being blamed on Henry, and unfounded complaints of

Henry being aggressive toward other employees.  Henry had actually been issued two Letters of

Warning–on June 20 and 26–by the date Henry mentioned in the narrative.  I conclude that a

claim based on either of these Letters of Warning is reasonably related to his administrative

claim.  Accordingly, this court has jurisdiction over  a claim based on the June 26 Letter of

Warning.

II.      Race Discrimination

        Henry alleges a race discrimination claim under Title VII under four theories:  (1) for

failing to comply with the Settlement Agreement; (2) for failing to recommend him for a transfer

to HRSSC; (3) for making false accusations about his job performance; and (4) for harassing him

in the Multnomah Station supervisor position.  Compl. ¶ 18.  He argues that it is critical to

analyze this case in the context of the rampant history of race discrimination at the USPS

Portland District.

        A.      Breach of Settlement Agreement

        Defendant argues that the court lacks jurisdiction over a Title VII claim based on breach

of the 2006 Settlement Agreement.  According to defendant, Henry's only remedy for any breach

of a settlement is to ask the EEOC to reinstate the EEO complaint under 29 C.F.R.

§ 1614.504(a).

        Henry relies on Munoz v. England, 557 F. Supp.2d 1145, 1158 (D. Haw. 2008), for its

holding that courts have jurisdiction over breach of a settlement agreement in a Title VII action

but are limited to specific performance of the agreement as the remedy.

        Two circuits have ruled that federal courts lack jurisdiction over a claim that the federal

government breached a settlement agreement executed in statutory discrimination claims.  Frahm

v. United States, 492 F.3d 258 (4th Cir. 2007) (Title VII); Lindstrom v. United States, 510 F.3d

1191 (10th Cir. 2007) (Title VII remedies as incorporated by the Americans with Disabilities Act

and Rehabilitation Act).  Both courts reasoned that Congress limited its waiver of sovereign

immunity to the remedies specified in 29 C.F.R. § 1614.504(a) when a plaintiff claims that the federal government breached a settlement agreement resolving a discrimination claim with has Title VII remedies.  Frahm, 492 F.3d at 262; Lindstrom, 510 F.3d at 1194-95.  Section 1614.504 provides alternative remedies for either specific enforcement of the settlement agreement or reinstatement of the underlying complaint for further processing from the point processing ceased.

I see no reason why the Ninth Circuit would not follow Frahm and Lindstrom.  Even Munoz does not help Henry because he seeks strictly monetary damages and not specific enforcement of the Settlement Agreement.  Accordingly, I find that this court does not have jurisdiction over Henry's claim that the USPS racially discriminated against him by failing to comply with the 2006 Settlement Agreement.  I grant summary judgment over that portion of the claim.

B.    Disparate Treatment

Henry's counsel clarified at oral argument that the disparate treatment discrimination claim is based on the following events:  (1) the 3999 mounted inspection; (2) not being hired at HRSSC; (3) the June 20 and 26 Letters of Warning; and (4) being removed from the Human Resources detail and put into the customer service position at Multnomah Station.

To prove a Title VII disparate treatment claim, a plaintiff must establish a prima facie case of discrimination.  A prima facie case may be demonstrated by direct evidence of discriminatory intent or, as is the case here, may be based on a presumption arising from factors set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Noyes v. Kelly Services, 488 F.3d 1163, 1168 (9th Cir. 2007).  Generally stated, the factors are:  (1) membership

in a protected class; (2) qualification for the job or satisfactory performance of the job; (3) an

adverse employment decision; and (4) different treatment than those similarly situated outside of

the protected class.  McDonnell Douglas, 411 U.S. at 802.  At summary judgment, the degree of

proof necessary to establish a prima facie case is "minimal and does not even need to rise to the

level of a preponderance of the evidence."  Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th

Cir. 2008) (internal quotation omitted).

      1.     3999 Mounted Inspection

Defendants argue that the 3999 mounted inspection which reinjured Henry's knee is not

an adverse employment action that can support a disparate treatment claim.

An adverse employment action is one that materially affects the compensation, terms,

conditions, or privileges of employment.  Davis, 520 F.3d at 1089.  Davis allowed a disparate

treatment claim based on more burdensome work assignments for extra overhead piping which

caused plaintiff to suffer physical pain.  The 3999 mounted inspection injured Henry to the point

that his worker's compensation claim was accepted.  I conclude that the 3999 mounted inspection

can be an adverse employment action in support of Henry's disparate treatment claim.

      2.     Not being Hired at the HRSSC

Defendant contends that Batchelor did not discriminate against Henry by failing to

recommend him for the HRSSC position because Batchelor did not know that Henry applied for

it.  According to defendant, Henry did not tell Batchelor about his April 2007 application, and

Batchelor was neither asked for a reference nor learned of the application from another source.

Defendant claims that Batchelor's comments in the June 2007 meeting concerning

recommending Henry were advisory because Batchelor did not know if any non-competitive

detail opportunities existed.

Above, I dismissed the portion of Henry's claim that the USPS breached the Settlement

Agreement. A slight variation of the claim remains concerning whether Batchelor discriminated

against Henry by failing to recommend him for the HRSSC position. The actual hiring decisions

were made at the HRSSC by people whom Henry does not accuse of discrimination.

There is no evidence in the record that Batchelor knew Henry had applied for HRSSC

positions. Henry's discussion with Batchelor in the summer of 2007 was advisory in nature and

based on theoretical job possibilities. Henry did not inform Batchelor of Henry's three

applications and Batchelor did not learn of the applications from any other source. No one at

HRSSC asked Batchelor for a reference. Batchelor could not discriminate against Henry by

failing to recommend him for a position if Batchelor did not know of the need for a

recommendation. Henry has failed to raise a factual issue that Batchelor knew of the need.

Thus, I grant summary judgment on this part of the disparate treatment claim.

3.    Remaining Adverse Employment Actions

The remaining portions of Henry's disparate treatment race discrimination claim are: (1)

being removed from the Human Resources detail and put into the customer service position at

Multnomah Station; (2) the June 20 and 26 Letters of Warning; and (3) the 3999 mounted

inspection.

> If established, the prima facie case creates a rebuttable presumption that
> the employer unlawfully discriminated against the plaintiff. The burden of
> production then shifts to the employer to articulate a legitimate, nondiscriminatory
> reason for its action. If the employer meets this burden, the presumption of
> unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr.

> v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The
> plaintiff then must produce sufficient evidence to raise a genuine issue of material
> fact as to whether the employer's proffered nondiscriminatory reason is merely a
> pretext for discrimination.  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282
> (9th Cir. 2000).

Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1037 (9th Cir. 2005) (some internal

citations omitted).

"[A] plaintiff can prove pretext in two ways:  (1) *indirectly*, by showing that the

employer's proffered explanation is unworthy of credence because it is internally inconsistent or

otherwise not believable, or (2) *directly*, by showing that unlawful discrimination more likely

motivated the employer."  Noyes, 488 F.3d at 1170 (internal citation and quotation omitted).

"When the evidence is direct, [we] require very little evidence to survive summary judgment in a

discrimination case.  But when the plaintiff relies on circumstantial evidence, that evidence must

be specific and substantial to defeat the employer's motion for summary judgment."  EEOC v.

Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (internal quotation omitted); Nilsson v. City of

Mesa, 503 F.3d 947, 954 (9th Cir. 2007); see also Davis, 520 F.3d at 1091 & n.6 (declining to

resolve whether circumstantial evidence of pretext must be specific and substantial, as opposed

to a lesser amount such as is sufficient for direct evidence, and noting the two lines of cases

emerging within the circuit).

Defendant seeks summary judgment on the Human Resources detail part of the claim by

noting that much of that department's work was transferred to the HRSSC, as had been

scheduled.

Page 20 - OPINION AND ORDER

I will assume that Henry has established a prima facie case on his reassignment. The issue, then, is whether Henry has raised a factual issue that defendant's reason for the transfer is a pretext.

It is undisputed that much of the human resources function was moving from Portland to the HRSSC. It is undisputed that Henry applied for and was selected to be a Supervisor in Customer Services at Multnomah Station in March 2007 but continued to work on the detail in Human Resources. It is undisputed that the job bidding function Henry performed in Human Resources was moved to HRSSC by September 2007, after Henry had performed the job for about eight months. It is also undisputed that the President of Local 315 had complained to Batchelor about Henry's performance in Human Resources. Finally, it is undisputed that when the job bidding function ended in Human Resources, Henry was transferred to the Supervisor position at Multnomah Station that he had won six months earlier.

Defendant's action in moving Henry to Multnomah Station was the logical thing to do. To show pretext, Henry would have to raise a factual issue that defendant did not find him a *new* detail in a smaller Human Resources department because of racial animus. Henry's argument is based on evidence of historical race discrimination in the Portland District. With no direct evidence of unlawful discrimination, I find the older conduct is insufficiently tied to Henry's situation in September 2007 to allow a jury to find for him on this aspect of the disparate treatment claim. Accordingly, I grant summary judgment and dismiss the portion of the disparate treatment claim that Henry was transferred to the Supervisor position at Multnomah Station from the Human Resources detail because of race discrimination.

Page 21 - OPINION AND ORDER

That leaves the June 20 and 26 Letters of Warning and the 3999 mounted inspection portions of the disparate treatment claim. This conduct all took place while Henry worked at Multnomah Station under Spina-Denson. Defendant seeks summary judgment on these issues by arguing that Henry was not performing his job satisfactorily and that it did not treat him differently than similarly situated employees.

There is evidence that the Spina-Denson had unreasonable expectations about the amount of work Henry could accomplish as the closing supervisor, leading to the Letters of Warning; that Spina-Denson supervised Henry much more closely than the Caucasian supervisors by holding numerous separate meetings with Henry and excluding him from some of the meetings with the Caucasian supervisors; that Spina-Denson had supervisors monitor African-American employees more closely than Caucasian employees; that Henry offered to get medical documentation prior to the 3999 mounted inspection which Spina-Denson refused to accept; and that Henry had more onerous documentation requirements than Caucasian employees when trying to get FMLA leave to care for his wife. In short, too many issues of fact remain for the court to dismiss the remaining portion of the disparate treatment claim. Accordingly, I deny this part of defendant's motion and allow the disparate treatment claim concerning the June 20 and 26 Letters of Warning and the 3999 mounted inspection to proceed to trial.

C.    Hostile Environment

Henry's hostile environment claim is based on his treatment while at Multnomah Station.[4] Defendants argue that Henry cannot survive summary judgment on his hostile environment claim

---

[4] Henry's counsel clarified at oral argument that Henry has waived any claim in this action that Spina-Denson's December 2008 trip to Henry's house is racial harassment.

because the conduct he complains of was not based on his race and was not sufficiently hostile to

constitute a hostile work environment.

>In determining if an environment is so hostile as to violate Title VII, we
consider whether, in light of "all the circumstances," Nichols v. Azteca Rest.
Enter., 256 F.3d 864, 872 (9th Cir. 2001), the harassment is "sufficiently severe or
pervasive to alter the conditions of the victim's employment and create an abusive
working environment." Meritor, 477 U.S. at 67, 106 S. Ct. 2399 (internal
brackets and quotation marks removed). The Supreme Court has followed a
"middle path" with regard to the level of hostility or abuse necessary to establish a
hostile work environment. Harris v. Forklift SYS., Inc., 510 U.S. 17, 21, 114 S.
Ct. 367, 126 L. Ed. 2d 295 (1993). Simply causing an employee offense based on
an isolated comment is not sufficient to create actionable harassment under Title
VII. Id. However, the harassment need not cause diagnosed psychological injury.
Id. at 22, 114 S. Ct. 367. It is enough "if such hostile conduct pollutes the
victim's workplace, making it more difficult for her to do her job, to take pride in
her work, and to desire to stay on in her position." Steiner, 25 F.3d at 1463.

>A plaintiff must show that the work environment was both subjectively
and objectively hostile. Nichols, 256 F.3d at 871-72 . . . .

>In evaluating the objective hostility of a work environment, the factors to
be considered include the "frequency of discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere offensive utterance;
and whether it unreasonably interferes with an employee's work performance."
Nichols, 256 F.3d at 872 (quoting Harris v. Forklift SYS., 510 U.S. at 23, 114 S.
Ct. 367). "The required level of severity or seriousness varies inversely with the
pervasiveness or frequency of the conduct." Id. (internal quotation marks
omitted).

McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir. 2004). The objective hostility of

the workplace is analyzed from the perspective of the plaintiff. Id. at 1115.

In the hostile environment claim, Henry relies on the same evidence that supports an

inference that racial animus caused him to receive two Letters of Warning, in particular the

alleged excessive supervision, and to be required to conduct a 3999 mounted inspection in spite

of his objection that he was injured. As above, Henry has raised a factual issue that the conduct

Page 23 - OPINION AND ORDER

was because of his race.  I also conclude that he has raised a factual issue that the conduct was

sufficiently hostile to constitute a hostile work environment.  Consequently, I deny defendant's

motion for summary judgment against the hostile environment claim.

III.    Retaliation

Henry claims that all of Batchelor's actions concerning his supervision of Henry in the

Human Resources detail, Henry's attempt to transfer to HRSSC, and Henry's transfer to a

customer services supervisor position he did not want at Multnomah Station were retaliatory

adverse employment actions for his prior EEO complaint which was settled in March 2006.

Henry's counsel clarified at oral argument that the events occurring when Henry worked at

Multnomah Station are evidence of disparate treatment and hostile environment discrimination

but are not evidence in the retaliation claim.

Defendant claims that Batchelor's involvement in Henry's prior EEO settlement cannot

establish a retaliatory motive because the time gap was too great and Batchelor was only

involved as the agency representative.

In the analysis above, I dismissed Henry's disparate treatment claims related to the

HRSSC position and defendant's transfer of Henry from the Human Resources detail to the

Supervisor position at Multnomah Station.  For the same reasons, I dismiss those two portions of

the retaliation claim.  That leaves only Batchelor's general supervision of Henry.  The only

incident plaintiff raised was a meeting Batchelor held in June 2007 concerning the complaint

about Henry from the President of Local 315.  I dismiss this remaining portion of the retaliation

claim for two reasons.

In a Title VII retaliation claim, a plaintiff can prove a prima facie case by establishing the following factors:  (1) involvement in a protected activity; (2) an adverse employment action; and (3) a causal link between the activity and the employment action.  If the plaintiff establishes the prima facie case, the burden shifts as in a disparate treatment case.  Nilsson, 503 F.3d at 953-54. The causal link can be inferred from circumstantial evidence, such as the proximity in time between the protected activity and the retaliatory employment decision.  Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1069 (9th Cir. 2003) (only nine days lapsed between complaint and termination).  See also Clark County School District v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508 (2001) (citing with approval cases holding that a three month period and a four month period were insufficient to establish causation for a prima facie case when there is no causation evidence beyond the temporal proximity); Ray v. Henderson, 217 F.3d 1234, 1244 (9th Cir. 2000) (first retaliatory action occurred two and one half months after first in a series of complaints); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that a two-to-three-month delay was not too long to establish a causal link sufficient to withstand summary judgment and citing with approval Hochstadt v. Worcester Found. for Experimental Biology, Inc., 425 F. Supp. 318, 324-25 (D. Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976), which held that a six-month delay could satisfy the causation requirement); but see Villiarimo v. Aloha Island Air, 281 F.3d 1054, 1065 (9th Cir. 2002) (nearly 18-month lapse between protected activity and adverse employment action is too long, by itself, to give rise to an inference of causation and citing cases from other circuits with similar holdings for periods ranging from four to eight months); Manatt v. Bank of America, NA, 339 F.3d 792, 802 (9th Cir. 2003) (nine months too long to establish causation).

Page 25 - OPINION AND ORDER

Henry settled his 2005 EEO Complaint in March 2006.  He did not return to Human Resources under Batchelor until he graduated from the ASP in January 2007.  That is already a nine month gap between the protected activity and when Batchelor began to supervise him.  The meeting of which Henry complains took place in June 2007, fifteen months after his protected activity.  This is too long of a time under the case law cited above to establish causation.

The second problem is whether the meeting in June 2007 is an adverse employment action.  An adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity.  Ray, 217 F.3d at 1243 (new policies that decreased pay, decreased the amount of time to complete the same amount of work, and decreased the ability to influence workplace policy were found to be adverse employment actions); Poland v. Chertoff, 494 F.3d 1174, 1180 (9th Cir. 2007) (initiation of an investigation and a transfer across the country were adverse employment actions).  Employment decisions that can constitute an adverse employment action include termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review, and refusal to consider for promotion.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  Other employment decisions are not sufficient to deter reasonable employees from complaining about Title VII violations and, thus, are not considered adverse employment actions.  These include declining to hold a job open for an employee, "badmouthing" an employee outside of the job reference context, transferring an employee where salary is unaffected, ostracism at the hands of coworkers, and work assignments with the harasser's friends as long as the friend shows no outward signs of hostility.  Id. at 928-29.  Moreover, actions which are subject to appeal, such as

negative performance reviews and shift and vacation assignments, are not sufficiently final to

constitute an adverse employment action.  Id. at 929-30.

Batchelor took issue with Henry's job performance in the meeting but gave Henry no

discipline.  There is no evidence that anything concrete occurred as a result of the meeting.  Thus,

Henry has failed to raise a factual issue that the June 2007 meeting was an adverse employment

action.

With no adverse employment action or causation, I grant summary judgment and dismiss

the retaliation claim.

## CONCLUSION

Defendant's Motion for Summary Judgment (#18) is granted in part.

IT IS SO ORDERED.

Dated this _____23rd_____ day of July, 2010.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge